Please call the last case. 212-380, Leticia Varela v. Ask the Province. Counsel, you may proceed. Good morning. May it please the Court? Counsel, Brent Schmitz on behalf of the petitioner Leticia Varela. To anticipate the first question, I think I'll start by saying that this is a case where there's conflicting medical evidence. That medical evidence was … It's always good to recognize the state of the evidence, yes. Thank you, Mr. Justice. It's conflicting medical evidence. The role of the Commission is to assess the credibility and to weigh that evidence. What I'm asking for today is a finding that on the facts of this case, the Commission's reliance on the opinions of Dr. Suchi is patently unreasonable. Now, the Commission's conclusions and the Commission's weighing of the evidence have to have some sort of reasonable basis. In this case, the basis for the Commission's opinions are primarily the opinions of Dr. Suchi, Respondent Section 12 Examiner. Now, Dr. Suchi, three months after the accident, performed a physical exam, reviewed an MRI, said, it's left-sided bulging on the MRI, but she's got right-sided complaints. It doesn't make any sense to me. I think she's fine. Now, if the case ended there, that would be it. This would be straight IME v. Treater, and I wouldn't really have a basis to be standing before you today. The problem is that there's a whole lot of things that happened after Dr. Suchi's examination that Dr. Suchi was never aware of. Does this case, let me ask you a pointed question, really turn on Dr. Suchi? Does it really turn on conflicting medical evidence? As I'm reading the decision and what it turns on, the Commission looked at the fact that your client testified he immediately felt symptoms of the right side of his neck with soreness, stiffness. His medical records don't support that. When initially seeking medical care on November 17th and 21st, 2006, the claimant did not report any neck symptoms and instead complaints involved his right upper arm and shoulder. He then reported to Dr. Palowski he had pain and stiffness in his lower part of his neck. The medical records otherwise failed to reflect any further report of neck symptoms until over six months later. So don't we also have some issues with regard to the credibility of the claimant in this case? Mr. Justice, I didn't want to interrupt you, but I think you may have the wrong case. There was the date of accident is after 2006 here. This is Borrella v. Asked Products. I'm sorry. So this case, I think, does turn on medical evidence. This isn't about the credibility of the petitioner. All right. So tell us then why the commission, if you alluded to the general rule, it's within their province to weigh the conflicting testimony and sort that out. Why is that against the manifest way of the evidence? The reason it's against the manifest way of the evidence is because the commission placed its reliance upon the opinions of a doctor who didn't have anywhere near all the relevant information. Now, if I'm looking at Dr. Suchi's report on its own at the time it was issued, I could understand Dr. Suchi. I'm not trying to disagree or to throw Dr. Suchi under the bus. He's a reputable guy. He knows what he's talking about. But there's a whole lot of things that Dr. Suchi didn't have. Dr. Suchi didn't have the epidural steroid injections that would later be performed. He didn't know how those would turn out. Dr. Suchi didn't know that there was going to be an FCE done in August of 2009 with validity testing that showed that the petitioner didn't appear to be faking anything and that she was only capable of sedentary work. Dr. Suchi didn't know that there was going to be a discogram with a post-discogram CT that was going to show a grade 5 tear. Dr. Suchi didn't know that a board-certified orthopedic surgeon at Northwestern, Dr. Yuri Goreshin, who the arbitrator even called highly credible, was going to take a look at this, see a collapsed disc at L5S1, and recommend a fusion surgery. I don't think it's appropriate for the commission to rely upon the opinions of Dr. Suchi when there's a whole lot of evidence out there that the arbitrator had the opportunity to see, but Dr. Suchi did not. All right. So what you seem to be saying is an opinion is only as good as the underlying information upon which it's based. If there's a problem with the underlying information, then the opinion is flawed. It has to be your position, right? That's correct, Your Honor. Okay. I don't think that the information that Dr. Suchi had at the time was necessarily flawed. I think it was simply incomplete. The example I draw is I'm a football fan. And so the example I draw is that Dr. Suchi is the referee on the field. He sees one angle, and he throws a flag. He makes that call. But the referee under the hood is going to have access to six or seven camera angles. He's going to have a better chance to see what really happened. And that's what happened here. Dr. Gresham was able to see the FCE. He was able to see the results of injections. He was able to see the post-discogram CT that showed the grade 5 tear. He had all that information. Dr. Suchi did not. And so I think the commission's reliance upon Dr. Suchi is faulty on that basis. And I would ask that you overturn the commission's decision as to causal connection. With that, I'll step down. Thank you.  Thank you for your argument. Counsel, you may respond. Good morning. Elizabeth Coppoletti on behalf of the employer. Asked products. This case is not a complicated case. We're not talking about jurisdiction this time. We're not talking about statutory interpretation. It's a pretty straightforward case. Have you been here all morning? Pardon me? I haven't. I appreciated the subject matter jurisdiction, and it wasn't me. So this is a straightforward case. It is the manifest weight of the evidence case. The commission did its job. It looked at all the medical records. It heard the claimant's testimony. And it took the opinions of not just Dr. Suchi, Dr. Mazur and Dr. Johnston, who all three of them said this isn't causally related to her undisputed accident. There's no question she had an accident. The whole question before the commission was, is her present condition of ill-being related to that accident? And the commission heard her testimony, saw the medical records, and said, no, she failed to prove that there was causal relationship. And that opinion is supported by the evidence in the record. It is supported by Dr. Mazur, who she initially saw on January 15, 2009, who said, hey, there's some problems here, but her subjective symptoms do not match up with the diagnostic testing. Her subjective symptoms is my right leg is hurting, my back is hurting, but I'm looking at the MRI, which is a left-sided herniated disc. There's no correlation. And actually, Dr. Mazur said, I think there may be something else going on here. I think there may be some sort of systemic process here. Go get a CT scan of your pelvis, because that really may be what the problem is here. She goes to – she's also treating with Dr. Johnston during the meantime, sees him for the last time on January 20 of 2009, at which time Dr. Johnston also but really it's a strain. You need a couple more weeks of physical therapy. I'm going to keep you on light duty. Because Dr. Mazur had actually released her to full duty work and put her at MMI. Dr. Johnston was a little more conservative, said you need a couple more weeks of PT for this strain, you know, and then you should be able to go back to full duty. Thereafter, she's also evaluated by Dr. Sushi, who does then see her on February  Her symptomology is not correlating with the MRI find. Releases her full duty and puts her at MMI as of January 15, 2009. The claimant testifies that she doesn't go back to Dr. Johnston because she doesn't want to hear what he has to say, because he's going to tell her to go back to full duty work and that your strain is done. So instead, she goes off and sees Dr. Johnston, Dr. Engels. Dr. Engels does eventually do a discogram, I believe, in December. And that discogram is discordant. Again, her pain is produced on her left leg and her symptoms are all on the right side. And he even initially says, this disc isn't the cause of her pain. I mean, because of her symptoms and the results of this discogram. Now, he does ultimately change that, you know, opinion. But that's his initial opinion, is that they're not, it's disconcordant. She then goes to Dr. Gerson at the request of her attorney. Dr. Gerson says she's got degenerative disc disease, a problem at the L5S1 that's aggravated. Yes, that opinion's different than the other three doctors that saw her. And the commission took that into account and even said, look, Dr. Gerson's a good doctor. I like Dr. Gerson, but he had faulty information. He specifically said in his opinion it was based upon the positive provocative discogram. That's just not true. That's not what the discogram said. And the commission recognized that and said, look, his opinion is actually flawed because he got it wrong relative to the discogram. So the commission did its job. It looked at all of this information and reviewing all the information, including the claimant's testimony and the medical records and the opinions cited with Dr. Mazur, Dr. Johnson, and Dr. Suchi, and said that there was no causal relationship. And that decision is supported by ample evidence in the record. Therefore, I would request that the commission's decision be affirmed. Thank you. Thank you, counsel. Counsel in reply? Very briefly, Your Honors. First, with regard to the causal connection opinions of Drs. Mazur, Johnson, and Suchi, the problem with those opinions is that none of those doctors knew what the condition of ill-being was, and they couldn't possibly have known. They couldn't have known until the post-discogram CT was done showing the grade 5 tear and showing the collapsed disc at L5S1. If I didn't have that information, I'd probably call it a brain strain, too, if I'm Dr. Suchi or Dr. Mazur at the time they saw her. There's no way they could have known about the collapsed disc until the later diagnostics. So I think their opinions on causal connection are somewhat irrelevant to the case. With regard to the discogram with Dr. Goreshin, it does appear, based on Dr. Goreshin's notes, that the discogram, that he thought it was concordant, when it turned out it was actually discordant. I'm not disputing that. The problem here isn't whether the pain was concordant or discordant. The problem is the collapsed disc. Now, Dr. Engel did change his opinion. First he said, I think it's the disc. Then he did the discogram. He said, well, no, we did the discogram, and it's not concordant, so it's probably something else. So they did a medial branch block to rule out anything else. And the medial branch block didn't help. That diagnostic test didn't solve the problem. So the only thing we can do is go back to the disc. Dr. Goreshin recommended fusion to treat that. It was appropriate to do so. Dr. Goreshin had all the information at hand. He made the right call, and the commission erred in relying on the opinions of Drs. Mazur and Suchi. Thank you. Thank you, counsel. Mr. Mayor, if we take an advisement at this position, shall we?